IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs July 12, 2022

## ROBERT BEHAM v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**No. 16-00648        Carolyn Wade Blackett, Judge**

_____

### No. W2021-00771-CCA-R3-PC

_____

Petitioner, Robert Beham, appeals as of right from the Shelby County Criminal Court's denial of his petition for post-conviction relief, wherein he challenged his convictions for rape of a child and aggravated sexual battery. On appeal, Petitioner asserts that he received ineffective assistance of trial counsel because (1) counsel failed to request a "mental evaluation" and (2) counsel failed to present mitigating evidence in sentencing, specifically a psychosexual evaluation. Following our review, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and JOHN W. CAMPBELL, SR., JJ., joined.

Shae Atkinson, Memphis, Tennessee, for the appellant, Robert Beham.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Leslie Byrd, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

### Factual and Procedural Background

Petitioner was convicted by a Shelby County jury of rape of a child and aggravated sexual battery. *State v. Robert Beham*, No. W2018-01974-CCA-R3-CD, 2019 WL 6898356, at *1 (Tenn. Crim. App. Dec. 18, 2019), *perm. app. denied* (Tenn. Apr. 17, 2020). Petitioner was sentenced as a Range I, standard offender to concurrent sentences of forty years for rape of a child and ten years for aggravated sexual battery.

On direct appeal, this court summarized the proof presented at trial as follows:

. . . G.B. was the mother of the victim, A.W., and the sister of [Petitioner]. At the time of the offenses against the victim, G.B. had been dating DeAngelo Westley, who was the father of their two young boys but was not A.W.'s father. In September 2015, G.B., Westley, and the children were living with G.B.'s mother, S.B., and [Petitioner] in an apartment. At the time, A.W. was five years old.

. . . .

The morning of September 7, 2018, G.B. awoke and realized that they had no food for breakfast, so she and Westley left the apartment to purchase milk and cereal at a nearby store. When they left, the three children and [Petitioner] were playing video games in the living room, and S.B. was asleep in her bedroom upstairs. It took G.B. and Westley approximately five minutes to buy food at the store and return home. They entered the apartment and walked through the dining room to the kitchen so they could prepare breakfast for the family but did not see the children in the living room. G.B. called her children to eat breakfast, and the two youngest children walked into the kitchen from the dining room, but A.W. never came to eat. G.B. began trying to find A.W. She looked in the living room and saw [Petitioner] "getting up off the floor." She noticed that [Petitioner] had a surprised look on his face and that his pants were "kind of twisted" like he had just pulled them up. Then she noticed A.W., who did not have her pants on, getting up from the floor with a shocked look on her face "like she was in trouble or something." G.B. observed [Petitioner] hurrying to get A.W. pants on. She also noticed that the ottoman had been moved from its normal position so that it blocked the view into the living room from the front door.

G.B. asked A.W. why she had not come into the kitchen to eat breakfast and asked [Petitioner] why A.W.'s pants had been on the floor. [Petitioner] replied that A.W. had urinated on herself and that he had helped her change her clothes. G.B. took A.W.'s hand and saw that her daughter's underwear was at her ankle even though her pants had been pulled up. G.B. asked [Petitioner] where A.W.'s wet clothing was, and [Petitioner] did not answer. G.B. later discovered that A.W.'s underwear had a "streak of discharge" on it, but the underwear did not feel damp as if A.W. had urinated on it, and it did not smell of urine. G.B. said there were no other signs that A.W. had urinated on herself. She noted that A.W. was fully "potty-trained" and did not have a history of urinary problems.

-2-

G.B. said she fixed A.W.'s underwear and pants, put A.W. on her hip, and walked out the front door of the apartment with her. When they got outside, G.B. asked A.W. what happened, and A.W. got a "scared look on her face" and "put her head down" before replying that [Petitioner] had "touched" her. G.B. said that after A.W. told her what happened, [Petitioner], who was standing on the porch, kept yelling, "What did she say?"

G.B. took A.W. with her inside the apartment and told Westley that [Petitioner] had touched A.W. She noticed that [Petitioner] followed them back inside the apartment, where he began "cleaning up and doing things." G.B. went upstairs to awaken S.B., so S.B. could ask [Petitioner] what he had done to A.W. She explained to S.B. what A.W. had said to her and informed S.B. that she was calling the police. S.B. undressed A.W. in order to examine her, and G.B. and S.B. observed that A.W.'s genitals were wet and that there was a discharge on A.W.'s underwear. G.B. dressed A.W. without her underwear, which they left on the floor of S.B.'s bedroom, and S.B. went downstairs to talk to [Petitioner] about what had happened while G.B. called the police.

G.B. said that when S.B. asked [Petitioner] if he had touched A.W., [Petitioner] replied, "Man," and "got real[ly] sad" but never denied touching A.W. S.B. seemed "really stunned" and "shocked" and asked [Petitioner] why he would do that to his niece, and [Petitioner] got angry and ran up the stairs in order to attack G.B. G.B. picked up a remote and threw it at [Petitioner], hitting him on the top of his nose, which caused him to bleed, and Westley blocked [Petitioner] from coming up the stairs for G.B. As [Petitioner] continued to try to attack G.B., Westley fought him, and they ended up breaking a window as the police arrived. Then [Petitioner] "picked up a 2 x 4" board, and the police told him they would shoot him if he did not drop it. [Petitioner] eventually put the board down, and the police arrested him. G.B. told the police what had happened to A.W., and the police questioned everyone in the home, although [Petitioner] did not say much to the officers.

G.B. briefly talked to the police before riding with A.W. in an ambulance to the hospital. Then G.B. and her family took A.W. to the Rape Crisis Center, where the staff examined A.W. and asked her questions about the incident. G.B. said she was not present during A.W.'s examination or while the staff of the Rape Crisis Center asked A.W. questions. A day or two later, G.B. took A.W. to the Child Advocacy Center, where a forensic

interviewer talked to A.W. about what happened. G.B. was not present during A.W.'s forensic interview. She said that she did not talk to A.W. about the details of what [Petitioner] had done to her before taking her to the Rape Crisis Center or the Child Advocacy Center. G.B. said that following this incident, A.W. had problems "learning and being around people," so she had her go to therapy for a while.

A.W., who was seven years old at the time of [Petitioner]'s trial, testified that [Petitioner] was her uncle. A.W. stated that she had told the truth about what [Petitioner] did to her in the forensic interview at the Child Advocacy Center. She also said she understood the difference between a good touch and a bad touch. A.W. reviewed an illustration of a female figure and identified the vagina as "TT" and the buttocks as "butt." She also reviewed an illustration of a male figure and identified the penis as "TT."

A.W. said that, during the incident, [Petitioner] took off her pants and underwear. [Petitioner] touched her "TT" with his hand and then touched her "TT" with his "TT" while his pants and underwear were pulled down. She said that [Petitioner]'s "TT" looked hard when he touched her with it. She also stated that [Petitioner] put his "TT" inside her "TT" because it hurt. A.W. said that her mother, G.B., came into the room while [Petitioner] was touching her behind the couch and that [Petitioner] pulled his pants up and "lied" to G.B. about what he had been doing. She said that after her mother came into the room, she took her outside and asked her what happened, and A.W. told her that [Petitioner] "was touching on [her]." After this incident, A.W. went to the hospital and the Rape Crisis Center. She also went to the Child Advocacy Center two days later and told the staff there the truth about what [Petitioner] had done to her. A.W. said [Petitioner] also touched her "butt" with his "TT," but she could not remember whether that incident occurred on the same day as the other offenses.

DeAngelo Westley testified that in September 2015, he lived in Memphis with G.B., their two sons, A.W., S.B., and [Petitioner]. Westley said that on the morning of September 7, 2015, he and G.B. left the apartment to buy food for breakfast. When they left, [Petitioner] and the children were in the living room, and S.B. was asleep upstairs. When Westley and G.B. returned to the apartment ten minutes later, they entered through the front door, which swung into the apartment partially blocking the view to the living room, and they walked through the dining room into the kitchen. A few minutes later, they called their children for breakfast, and although their sons came into the kitchen, A.W. did not. He said G.B. went to look for

A.W., and then he saw G.B. take A.W. out the front door of the apartment and walk around by the pool. At the time, [Petitioner] repeatedly asked, "What did she say? What did she say?" When G.B. and A.W. returned to the apartment, G.B. told him that [Petitioner] had "touched" A.W. Westley said he was "shocked" and helped G.B. take A.W. upstairs to talk to S.B. about what happened. Westley said that he, G.B., and S.B. went downstairs. S.B. asked [Petitioner] if he had touched A.W., and [Petitioner] replied, "Man, man." He also noticed that [Petitioner] began "cleaning up" and "fidgeting[,]" even though [Petitioner] normally played video games. Then G.B. told [Petitioner], "I know you did it because you [are] acting weird," and [Petitioner] got mad at her. Westley told G.B. to go upstairs, and [Petitioner] tried to run after G.B. so he could fight her, and he and [Petitioner] "start[ed] scuffling." [Petitioner] left, and Westley went upstairs, and when [Petitioner] returned and tried to come upstairs a few minutes later, G.B. threw a remote at [Petitioner], which hit him in the nose and made him bleed. Then [Petitioner] got a "2 x 4" board and acted like he was going to hit G.B. with it just as the police arrived at the apartment. He said the police had to draw their guns before [Petitioner] finally put the board down and was placed in handcuffs. Westley said that since this incident, A.W. has acted differently, and he has tried to keep A.W. busy with activities so she wouldn't "have to think about" what happened.

Timmy Mitchell, an officer with the Organized Crime Unit of the Memphis Police Department, testified that on September 7, 2015, he responded to a domestic violence call at S.B.'s apartment. When he arrived, he noticed that the front door to S.B.'s apartment was open and that [Petitioner] was holding a "2 x 4" board. Another officer on the scene told [Petitioner] to put the board down, so he would not have to hurt him, and [Petitioner] eventually put the board down and was detained. Although [Petitioner] had blood on his face, he refused to go to the hospital. Officer Mitchell entered the apartment and saw that G.B. was "very upset" and "angry." G.B. told Officer Mitchell and the other officers that she had "walked in" and "[Petitioner] had [A.W.'s] legs open and was trying to penetrate her" or "had penetrated her." Upon hearing this, Officer Mitchell detained everyone in the apartment. He spoke to Westley, who stated that he had held [Petitioner] down until the police arrived. Officer Mitchell noted that S.B., [Petitioner]'s mother, "was more concerned about [Petitioner] than she was [A.W.]" and was "more worried about us hurting [Petitioner]." He said no one at the scene told him that [Petitioner] had confessed to touching A.W. inappropriately.

-5-

James Byars, a Sergeant with the Child Abuse Sex Crimes Unit of the Memphis Police Department, testified that he responded to the Rape Crisis Center, where he spoke with G.B. and A.W. before A.W. had her forensic examination. Sergeant Byars stated that he and Sergeant Lee spoke to A.W. outside the presence of her mother. When Sergeant Byars asked A.W. what happened to her, A.W. replied that [Petitioner] "had put his front TT in her TT and booty and it hurt." A.W. also told him that [Petitioner] had pulled her clothes down when these offenses occurred. Sergeant Byars said that he was the first officer to talk to A.W. about what happened. He said that he was unable to take a statement from the suspect and that he relied on the statement G.B. had given to the Department of Children's Services about what she observed.

Nina Sublette, a licensed family nurse practitioner and an expert in the fields of sexual assault nursing examination and advanced practice nursing, testified that she examined A.W. on September 7, 2015 at the Rape Crisis Center. Sublette said that because A.W. came to the center within four hours of the offenses, she was able to collect evidence for the rape kit during the examination. She also talked to A.W. outside the presence of her mother. When Sublette asked about what happened, A.W. said that [Petitioner] had "touched [her] TT with his TT." She said A.W. was "cooperative" and "quiet" when they talked. Sublette then conducted a forensic examination of A.W. and collected buccal swabs from A.W. as well as swabs from A.W.'s vulva and anus for the rape kit. She explained that for children who are premenstrual, she does not take a swab from the vaginal canal because the lack of estrogen in the body can make doing so painful. Sublette stated that A.W. was not wearing underwear when she arrived as the center, but she collected A.W.'s leggings. Sublette observed no physical injuries to A.W.; however, she said that "[d]epending on the type of assault and the type of object used, you may, or may not see injury." She added that in the "majority" of child victim cases, there is no injury, even if penile penetration has occurred, because of how the body naturally responds. Sublette said that based on her examination of A.W., she "could not say whether she was penetrated, or not." She noted that A.W. did not indicate that anything was hurting her at the time of the examination. Sublette later collected samples from [Petitioner] for the suspect kit.

Teresa Onry, a forensic interviewer for the Child Advocacy Center, testified that she conducted the forensic interview of A.W. on September 11, 2015. During this interview, A.W. said she lived with her mother and grandmother and that her uncle, [Petitioner], was in jail because he was "so

-6-

bad." She said that [Petitioner] took her pants and underwear off and "tried to get on [her]" and actually did get on her at her grandmother's home. During this interview, Onry showed A.W. illustrations of a female and male body, and A.W. identified the vagina as "TT," the penis as "TT", and the buttocks as "butt" or "booty[.]" A.W. told Onry that [Petitioner]'s "TT" touched the inside of her "TT" and that it hurt. A.W. also told her that [Petitioner]'s "TT" touched the inside of her "butt" and it "hurt." She said she was lying on the red couch downstairs in her grandmother's apartment when [Petitioner] touched her. A.W. asserted that [Petitioner] put his "TT" in her "TT" "a lot" and that [Petitioner] was the only person to put his "TT" in her "TT."

Christie Smith, a Special Agent Forensic Scientist with the Tennessee Bureau of Investigation and an expert in the fields of forensic biology and deoxyribonucleic acid (DNA) analysis, testified that she tested the rape kit containing the buccal, vulvar and anal swabs from A.W., and A.W.'s pants and underwear, as well as the suspect kit containing buccal and penile swabs from [Petitioner]. Special Agent Smith said that although she did not find any semen on A.W.'s buccal swab, anal swab, or the pants, A.W.'s vulvar swab tested positive for semen, and the pink underwear tested positive for sperm cells. She explained that on the vulvar swab, the only DNA profile she was able to obtain was from A.W. On the underwear, [Petitioner] was excluded from the sperm fraction in the DNA profile; however, the non-sperm fraction in the DNA profile was consistent with a mixture of two people, but because of the limited DNA profile obtained, her interpretation of this profile was inconclusive. When she conducted DNA testing on the penile swabs, the result was a mixture of DNA from at least two people but due to the limited profile, her interpretation of this profile was also inconclusive.

Special Agent Smith said she was asked to do further YSTR DNA testing on the vulvar swab that targets only male DNA. After testing the sperm fraction from the vulvar swab, she was only able to obtain a partial DNA profile that was inconclusive for comparison purposes, which meant that she was unable to include or exclude [Petitioner]. However, when she conducted YSTR DNA testing on the non-sperm fraction of the vulvar swab, she was able to develop a single source YSTR DNA profile that matched [Petitioner]'s known DNA from his buccal swab.

Special Agent Smith said that while she was able to detect semen on the vulvar swab, she was unable to tell who caused that semen to be there

because the only DNA profile she was able to obtain was consistent with the profile of A.W., the victim. In addition, she said that although the underwear contained a limited amount of sperm cells, [Petitioner] was excluded from the sperm fraction and the DNA profile for the non- sperm fraction was so limited that she was unable to conclusively identify to whom it belonged.

Special Agent Smith said that occasionally there is DNA in the non-sperm fraction that is from the sperm fraction, and vice versa. She reiterated that on the non-sperm fraction from the vulvar swabs, she was able to obtain a full YSTR DNA profile that matched [Petitioner]'s profile. She acknowledged that she was unable to tell the jury when [Petitioner]'s DNA was left or how it was transferred or deposited on the vulvar sample.

S.B., who testified for the defense, stated that [Petitioner] was her son, G.B. was her daughter, and A.W. was her granddaughter. On the morning of September 7, 2015, S.B. awoke when she heard G.B. screaming that [Petitioner] had done "something" to A.W. S.B. walked downstairs and asked [Petitioner] if he had done "something" to A.W, and [Petitioner] replied, "No." At the time, neither [Petitioner]'s nor A.W.'s clothes were in disarray. Then G.B. began fighting with [Petitioner] inside the apartment, and G.B. threw something at [Petitioner], which caused him to bleed. S.B. said Westley did not participate in the fight and only held G.B. back from [Petitioner]. She also said that A.W.'s underwear was not on her bedroom floor when she went downstairs to talk to [Petitioner] and that she first noticed the underwear when she came back upstairs after talking to the police.

S.B. acknowledged that she never saw the offenses involved in this case because she was in her bedroom upstairs at the time they occurred. She denied telling G.B. that this was a family problem that should stay in the family. She also denied telling G.B. that she should not call the police. S.B. admitted that she had a prior conviction for theft of property.

*Id.* at *1-4 (footnote omitted). This court affirmed the convictions on direct appeal, and our supreme court denied permission to appeal.

Relevant to this appeal, Petitioner argued on direct appeal that the trial court erred by enhancing Petitioner's sentence based upon prior criminal behavior. *Id.* at *9. At the sentencing hearing, G.B. testified that when she was a child, Petitioner "did the same thing" to her but that "there was never any justice[.]" *Id.* at *10. The presentence report officer detailed a Franklin County Juvenile Court investigation that occurred when G.B. was nine

years old and Petitioner was twelve years old. *Id.* G.B. reported that Petitioner had raped her. *Id.* A medical examination of G.B. reflected that her "rectum muscle was nearly non-operational[,] indicating repeated anal penetration on several occasions" and that blood was present inside her rectum. *Id.* After the investigation, Petitioner was charged with thirteen counts of rape of a child. *Id.* According to the presentence report, the juvenile court later found that Petitioner was not "psychologically competent to stand trial," but it noted that "placement" or release would endanger G.B. *Id.* The court later declared Petitioner to be dependent and neglected, and he remained in the custody of the Tennessee Department of Children's Services. *Id.* Further, Petitioner's presentence report reflected that his risk to reoffend was "high violent." *Id.* This court found that the trial court properly applied enhancement factor (1). *Id.* at *11.

In the pendency of his direct appeal, Petitioner filed a premature pro se petition for post-conviction relief, alleging generally that he had received ineffective assistance of counsel and that newly discovered evidence existed. After post-conviction counsel was appointed, Petitioner filed an amended petition alleging that he received ineffective assistance of counsel because trial counsel failed to properly review discovery with Petitioner, meet with him, conduct an adequate pretrial investigation, interview witnesses, advise Petitioner of the results of the investigation, and develop a sound defense strategy.

At the post-conviction hearing, co-counsel testified that he had practiced law for ten years and that he represented Petitioner at trial. Co-counsel stated that his partner was originally appointed as lead trial counsel and that co-counsel joined Petitioner's case because trial counsel was having health issues. Trial counsel passed away after Petitioner's trial.

Co-counsel testified that he and trial counsel visited Petitioner multiple times to review discovery, discuss the allegations, and consider whether Petitioner wished to proceed to trial. Co-counsel stated that the majority of the meetings were between ten and fifteen minutes during court hearings, although they also met with Petitioner for forty-five-minute jail visits for trial preparation. Co-counsel said that they also discussed the allegations with Petitioner's family, particularly Petitioner's mother. Co-counsel stated that Petitioner's mother was the "primary support" for Petitioner's position and that the rest of Petitioner's family supported the State's position.

Co-counsel testified that he explained to Petitioner what would happen at trial and that Petitioner was involved with developing the defense strategy, which was to show that G.B.'s version of events was implausible. Co-counsel said that Petitioner contributed to a diagram of the apartment and described its layout for the attorneys. Co-counsel denied that he or trial counsel ever told Petitioner that he had "nothing to worry about" because "no one [was] gonna show up" for trial.

Co-counsel testified that the first time he remembered reviewing Petitioner's juvenile court record was during trial, and he did not recall whether the defense had the record prior to trial.[1] Co-counsel stated that the defense "thoroughly" discussed the record and argued against its entry because no representative from Franklin County was present.

Co-counsel testified that based upon his meetings with Petitioner, he did not notice any "mental deficiencies" of concern; he stated that, although "there seemed to be some maybe developmental issues," Petitioner understood what was happening and could clearly communicate with them, understand the charges, and stand trial. Co-counsel stated that they "didn't have any reason to believe that he didn't understand the issues that were presented in discovery and . . . his position in the defense seemed reasonable to continue." When asked whether the defense team looked into Petitioner's prior medical or mental health records, co-counsel testified that Petitioner's mother gave them information about "some issues that he had in his past," but co-counsel did not recall anything that merited further investigation.

Co-counsel testified that nothing in trial counsel's file notes indicated why the defense did not pursue a competency evaluation. Co-counsel stated, though, that he and trial counsel did not feel that a competency evaluation would have been necessary or beneficial. When asked if Petitioner ever told them that the juvenile court found that he was "incompetent," co-counsel denied that Petitioner would have used that type of language. Co-counsel recalled that Petitioner told them that he went to court, had to go to counseling, and went home with his mother.

Co-counsel testified that Petitioner spoke with them about his having mental health issues, although co-counsel did not believe that Petitioner ever explicitly discussed being diagnosed as "bipolar schizophrenic." Co-counsel later said that he was unaware of Petitioner's mental health diagnoses. Co-counsel stated, though, that they considered whether Petitioner's mental health issues were "something that [they] could pursue" to assist the defense, but they did not feel enough information existed to benefit Petitioner.

---

[1] The trial transcript was not exhibited to the post-conviction hearing; however, we choose to take judicial notice of the trial record as contained in Petitioner's direct appeal. *See State v. Lawson*, 291 S.W.3d 864, 869 (Tenn. 2009) (holding, in relevant part, that an appellate court may take judicial notice of a fact even when the trial court fails to take judicial notice) (internal citations omitted). The only portion of the trial record reflecting discussion of the allegations occurred before G.B.'s testimony. Co-counsel addressed the trial court before the jury was brought in and informed the court generally that Petitioner allegedly abused G.B. when they were minors but that the State had instructed G.B. not to discuss them. The prosecutor clarified that DCS had substantiated the allegations, that Petitioner was "taken away from his mother and spent much of his childhood in some institutional-type therapy placement," and that a door could be opened to admit the allegations depending upon G.B.'s cross-examination. Co-counsel responded that the defense would tailor its questions to avoid opening the door and requested that the court find the evidence inadmissible so long as it was not elicited by the defense. The court indicated its assent.

Co-counsel did not know if trial counsel subpoenaed Petitioner's mental health records before co-counsel began work on the case, but co-counsel did not recall seeing any additional information about Petitioner's "psychological wellbeing" in trial counsel's file. Co-counsel said that, before trial, Petitioner's mother told them about the previous rape allegations. Co-counsel noted that Petitioner's mother doubted G.B.'s story and never indicated that she thought Petitioner was capable of "doing that." He stated that Petitioner's mother did not discuss that Petitioner was previously found to be incompetent and that instead "they talked about some deficiencies that [Petitioner] had and that they felt as though counseling was necessary."

Co-counsel testified that the defense team received[2] a printout from the State detailing Petitioner's previous juvenile court charges. Co-counsel remarked that "it seemed kind of weird the way that that [juvenile court] case kind of ended because it just kind of was left there" after Petitioner went to counseling. He did not recall seeing a final disposition of the juvenile court case. Co-counsel stated that they spoke about the previous charges during trial, when the State tried to bring out information about the charges and the defense team sought to exclude it; the trial court ultimately excluded the evidence. Co-counsel stated that the juvenile court allegations made it "very problematic" to present a defense that Petitioner had not committed the present rape.

Co-counsel clarified that the trial court and defense team had information about the juvenile court file in the presentence report but not the file itself or any mental health records. Co-counsel denied that the repeated sexual offenses alleged in the juvenile court case caused concern such that a competency evaluation was necessary; he observed that committing rape did not render a defendant incompetent to stand trial. Co-counsel reiterated that Petitioner was "very clear" and understood the defense presented at trial and that co-counsel and trial counsel did not think a competency claim had merit.

Co-counsel did not recall why a psychosexual evaluation was not performed in Petitioner's case. Co-counsel opined that it would not have been helpful to the defense theory, which was "not trying to highlight or bring out anything as far as any previous allegations" to avoid the jury's being persuaded of Petitioner's guilt based upon his alleged prior behavior. Co-counsel testified that, if they had intended to introduce a psychosexual evaluation at trial, they would have been obligated to share it with the State in discovery; additionally, if an expert would have testified about the evaluation, the expert's information would have to be disclosed to the State. When asked whether a psychosexual evaluation should have been performed to aid the defense, regardless of whether it would be used at

---

[2] It was not clear at the post-conviction hearing when the defense team received the printout. The trial record reflects that the State filed a pretrial discovery motion affirming that it had provided trial counsel with a "copy of the prior criminal record, if any, of the [Petitioner.]"

trial, co-counsel responded that the evaluation would not have assisted in the defense strategy challenging G.B.'s version of events.

Co-counsel acknowledged that a psychosexual evaluation could have been performed before sentencing, but he did not know if it would have been used as mitigation evidence. Co-counsel did not recall why they did not present mitigation evidence at the sentencing hearing, but he noted that if the defense team had beneficial information, they would have presented it.

On cross-examination, co-counsel testified that, in sentencing, the trial court considered the information about Petitioner's mental health diagnoses and prior treatment contained in the presentence report. Co-counsel agreed that, to his understanding, Petitioner was found incompetent by the juvenile court because he was twelve years old. Co-counsel affirmed that the prior allegations were "quite horrific" and that the physical damage to nine-year-old G.B. was "extensive." Co-counsel stated that the presentence report also included that Petitioner repeatedly "hunch[ed]" the family dog and was caught sneaking out to the dog's pen. Co-counsel agreed that the trial court considered the circumstances of the prior alleged offenses in sentencing, which this court concluded was proper on appeal.

Co-counsel testified that at the time of Petitioner's trial, he was familiar with the process of requesting a competency evaluation for a client and that he had done so in the past. Co-counsel stated that without Petitioner's assistance, they would not have had details about the family members' locations within the apartment and their sleeping arrangements.

Relative to a psychosexual evaluation, co-counsel testified that the defense team "figured if [they] went down that path and opened those doors that the likelihood that there would be something more prejudicial would be not worth the risk." He agreed that the defense challenged the circumstances of the alleged rape, including that the children were supervised by Petitioner for between five and ten minutes, that Petitioner's mother was home, and that Petitioner's mother provided testimony that was contrary to G.B.'s account. Co-counsel stated that relative to character evidence, the defense had "a line that [they] were needing to walk very carefully" when questioning Petitioner's mother to avoid opening the door to evidence of the previous allegations.

Petitioner testified that trial counsel and co-counsel represented him in this case. When asked whether trial counsel gave him a discovery packet, Petitioner stated that he remembered trial counsel's giving him an envelope and telling him that it was his discovery packet. He stated that he threw the envelope back to trial counsel because it was "just an envelope," and he did not know anything about the law. Petitioner stated that although he

did not remember all the times trial counsel visited him in jail, "he did come see [Petitioner]." Petitioner averred that he did not understand what was happening when trial counsel visited him.

Petitioner testified that trial counsel asked him about the allegations and that he told trial counsel that he did not do anything and would never harm his niece because he loved his nieces and nephews. Petitioner said, "[W]e[3] don't get along. That's why I had [to] stay away from her. I was there first." Petitioner stated that on the day of the alleged incident, he was in the house playing video games when "[s]he came in and started arguing for no reason."

Petitioner denied that trial counsel ever explained that they had to prepare a defense or talked to him about "ways to help [him] out." Petitioner stated that trial counsel conveyed a plea offer from the State for twenty-five years and that he declined the offer because he was innocent. When asked whether the attorneys ever explained what could happen if Petitioner went to trial, Petitioner agreed that the attorneys told him that he could "get a lot more time" if he went to trial. Petitioner testified, though, that he did not discuss going to trial with his attorneys and stated that they "just said [we were] going to trial." He asserted that trial counsel said that the State had "nothing." When Petitioner asked trial counsel what that meant, trial counsel stated that G.B. would not come to court and that they did not have to worry about it.

Petitioner testified that he previously received mental health treatment at "Youth Villages," where he was given medication. He stated that he was "big and angry all the time" and that when he was released, he saw a doctor for a "mental evaluation." Petitioner said that he was prescribed Seroquel "and stuff like that," which "really messed [him] up" by causing headaches, "crazy thoughts," and constant anger. He stated that he was "sick of this," that his life was "basically over with," and that he gave up "everything." Petitioner said that he was diagnosed with bipolar disorder and schizophrenia, although he did not know what that meant. He noted that the doctors "just diagnosed [him] cause of [his] father." Petitioner stated that he told his attorney about having bipolar disorder because "that's all [he] heard people say[.]" He added that he did not know he was schizophrenic. Petitioner explained that as a result of having "something done to [him] when [he] was locked up coming out of FAC," he did not like people to stand behind him. Petitioner also expressed that he became lightheaded in crowds and that he stayed at home and did not cause trouble.

Petitioner denied that he ever told his attorneys about his juvenile court case. He stated that he did not remember what happened in juvenile court because he was confused

---

[3] It was unclear whether Petitioner referred to G.B. or A.W. here.

and did not know what an attorney or a judge was. He added that although he now understood what a judge and prosecutor did, he still did not know certain things. Petitioner testified that at the time of the post-conviction hearing, he was taking one medication to treat vertigo. He added that, at the time of his trial, he took no medications.

On cross-examination, Petitioner testified that trial counsel did not explain things to him until they "got near trial." He noted that trial counsel did not explain the "doctor lady" who testified about A.W.'s examination. Petitioner denied that he and trial counsel discussed the allegations before trial. When asked what he discussed during the meetings with trial counsel, Petitioner responded that the attorneys asked him about "the situation" and that he did not know with what offenses he was charged. Petitioner agreed that regardless of what the State offered, he would not have accepted it because he had done nothing wrong.

Petitioner testified that he had "been through a lot" because of G.B., who did not like him. Petitioner denied raping G.B. Petitioner said that he had been raped previously and that he was not forensically examined. He denied telling his attorneys about the incident or his juvenile court history, and he noted that they never asked him about the juvenile court case.

At this point, the post-conviction court asked for Petitioner to take a brief break in order to "calm down." During the recess, the court asked the State and post-conviction counsel whether Petitioner underwent a competency evaluation before or after trial. The judge noted that from what she remembered, Petitioner seemed to have "gotten worse." The State told the court that Petitioner was not taking any medication at the time of trial, that Petitioner indicated he was not taking mental health medication at the time of the post-conviction hearing, and that the Tennessee Department of Correction was "usually very diligent in evaluating" inmates. The court noted with concern a "significant change in [Petitioner's] personality than it was before" and Petitioner's repeatedly referring to his not remembering or understanding court procedures.

When the hearing recommenced, Petitioner testified that he had not told anyone at the prison about having had a competency evaluation in connection with his juvenile court case; he noted that the prison had his records "from 201" and Youth Villages. Petitioner stated that he did not tell anyone about his mental health history because he did not want people to know that he had an intellectual disability. Petitioner said that it took him more time to "comprehend certain things." Petitioner agreed that he had heard a voice in his head previously but that he was afraid to tell anyone at the prison about the voice.

At the close of proof, the post-conviction court asked post-conviction counsel to specify for which grounds Petitioner requested relief. Post-conviction counsel alleged that

trial counsel and co-counsel were deficient for not requesting a "mental evaluation" before trial, by which post-conviction counsel seemed to refer to a competency evaluation. Post-conviction counsel argued that trial counsel and co-counsel could have asked Petitioner's mother about his mental health history, that the allegations involving G.B. and the family dog occurred ten years before the trial, and that the previous competency determination in juvenile court should have placed trial counsel on notice that a competency evaluation was needed, regardless of whether the juvenile court deemed Petitioner to be incompetent due to his young age or for another reason.

As a second ground for Petitioner's ineffective assistance of counsel claim, post-conviction counsel argued that trial counsel and co-counsel were deficient for failing to request a psychosexual evaluation before sentencing. He noted that the State presented proof supporting a sentencing enhancement based upon the offenses' having been committed for sexual pleasure.[4] Post-conviction counsel stated that the defense had no argument or proof in this regard because trial counsel and co-counsel failed to request that Petitioner undergo a psychosexual evaluation. Post-conviction counsel averred that the presentence report should have put trial counsel on notice that "something was up" such that a psychosexual evaluation was required.

After the parties presented arguments, post-conviction counsel stated that Petitioner's mother was sending him Petitioner's medical records but that he had not yet received them. Counsel requested to late-file the records as an exhibit to demonstrate what mental health records were available to trial counsel at the time of trial. The State indicated that it needed an opportunity to review them before consenting to their entry, and the prosecutor noted that she might need to question co-counsel further. The post-conviction court stated that it would accept the records as a late-filed exhibit if they were properly authenticated by affidavit. No affidavit is included in the appellate record; however, the medical records are included in the exhibit volume associated with the post-conviction hearing, and the post-conviction court stated in its written order that it had considered the late-filed exhibits.

The medical records consisted of family therapy session, treatment, and medication notes from Youth Villages beginning on December 28, 2005, and ending on May 2, 2009, when Petitioner was discharged into the care of his mother. Petitioner was fourteen years old when he entered Youth Villages. The records noted throughout that Petitioner had been diagnosed with residual schizophrenia, bipolar disorder, disruptive behavior disorder, an unspecified mood disorder, and moderate mental retardation. Petitioner exhibited "explosive" anger when frustrated and acted impulsively, which generally improved with

---

[4] The record reflects that the trial court applied this enhancement factor only relative to Petitioner's rape of a child sentence because it was an element of aggravated sexual battery.

treatment; however, on a November 2007 home visit, Petitioner began screaming, throwing objects, and hitting a car with his hands when two people in the home were arguing too loudly. Petitioner's mother was initially very involved with Petitioner's treatment and was working to bring him home with appropriate supports but, after the incident, she decided not to allow him to return. She asked the Youth Villages staff to inform Petitioner of her decision because she was afraid of his anger. Subsequent notes described her relationship with Petitioner as "strained."

The records recounted that at the time of his admission, Petitioner had a history of "openly masturbating in front of others" daily, watching pornography on the television or his computer, and "aggression, psychosis, [and] inappropriate sexual behavior." The records documented that as a result of the charges related to G.B., Petitioner received three years of "residential treatment." In addition, the records contained accounts of two violent incidents preceding Petitioner's involvement with Youth Villages. In the December 2005 incidents, Petitioner threatened to cut his sister with a knife following an argument, threatened to harm his neighbors, chased his younger sister and brother with a "machete" threatening to cut them, and yelled, screamed, and cursed at his ten-year-old brother because his brother was playing with one of Petitioner's toys. Petitioner's mother reported that Petitioner's verbal aggression and threats occurred daily. In a later record, Petitioner's mother opined that medications Petitioner was prescribed contributed to his aggressiveness, and she noted that Petitioner had since been taken off most of the medications. The records also included that Petitioner's mother gave up custody of him to the State "because she feared for the safety of her other children." Petitioner's mother also reported behavioral difficulties with Petitioner's younger brother and mentioned multiple times her desire to relinquish him to State custody.

Petitioner's mother acknowledged in earlier records that G.B.'s rape allegations were "substantiated" by DCS, but in a later record, Petitioner's mother stated that she "could not prove if" Petitioner raped G.B. The records documented that Petitioner had been sexually assaulted by an older patient at a treatment facility in 2002. A November 2006 family session note reflected that Petitioner did not think he needed to participate in a "JSO" group, which appeared to be for juvenile sex offenders. A January 2007 family session note reflected that Petitioner's mother and his case manager were "concerned over [Petitioner's] reluctance to work on JSO issues." After the session, Petitioner agreed to begin working on the JSO issues.

A May 3, 2008 record reflected that Petitioner "engage[d] daily in verbal aggression" and threats toward others; in addition, it was noted that Petitioner had weekly incidents involving physical aggression. The record stated that Petitioner had transitioned into a group home, that Petitioner had "poor insight into his . . . sexual behaviors towards his sister," and that Petitioner's aggressive behavior and paranoia impacted his mother's

ability to provide him with adequate structure. An April 29, 2009 family session note reflected that Petitioner read a "trauma narrative" to his mother, and the family discussed his returning home; it was unclear why Petitioner's mother changed her mind about her ability to care for Petitioner. The final family session note dated May 2, 2009, documented that Petitioner and his mother completed the discharge process.

The post-conviction court entered a written order denying post-conviction relief. Relevant to the issues on appeal, the post-conviction court implicitly accredited co-counsel's testimony that Petitioner was able to "communicate, understand, and participate in his defense," as well as co-counsel's belief that a competency evaluation was not necessary and would not have been helpful to Petitioner's case. The court further noted co-counsel's opinion that a psychosexual evaluation could be more harmful than helpful and that presenting evidence of Petitioner's mental health could open the door for evidence of Petitioner's "prior sexual misconduct," which trial counsel wanted to avoid eliciting in front of the jury. The court found that, given the defense theory that Petitioner was innocent of the offenses, trial counsel's strategy was reasonable. The court also found that Petitioner failed to present evidence of how a mental health or psychosexual evaluation would have changed the outcome of his trial. Petitioner late-filed a notice of appeal with this court's permission.

## Analysis

On appeal, Petitioner asserts that he received ineffective assistance of counsel because counsel failed to request a competency evaluation, and he contends that he would have been found incompetent to stand trial if an evaluation had been conducted. Petitioner also argues that counsel provided ineffective assistance by failing to present a psychosexual evaluation as mitigation evidence in sentencing. The State responds that Petitioner has waived review of both issues for failure to raise them in the post-conviction petition; alternatively, the State argues that Petitioner has failed to prove that counsel was deficient or that he was prejudiced.

The State correctly observes that Petitioner did not include the competency and psychosexual evaluation issues in the post-conviction petition, as amended. Generally, issues not raised in the post-conviction petition are subject to waiver. *See, e.g., Matthew B. Foley v. State*, No. M2018-01963-CCA-R3-CD, 2020 WL 957660, at *7 (Tenn. Crim. App. Feb. 27, 2020) (citing *Lonnie Lee Angel, Jr. v. State*, No. E2018-01551-CCA-R3-PC, 2019 WL 6954186, at *7 (Tenn. Crim. App. Dec. 18, 2019)). However, this court may extend appellate review to issues presented for the first time at the post-conviction hearing "if the issue was argued at the post-conviction hearing and decided by the post-conviction court without objection." *Holland v. State*, 610 S.W.3d 450, 458 (Tenn. 2020) (citations omitted).

## I.

### *Standard of review*

In order to prevail on a petition for post-conviction relief, a petitioner must prove all factual allegations by clear and convincing evidence. *Jaco v. State*, 120 S.W.3d 828, 830 (Tenn. 2003). Post-conviction relief cases often present mixed questions of law and fact. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Appellate courts are bound by the post-conviction court's factual findings unless the evidence preponderates against such findings. *Kendrick v. State*, 454 S.W.3d 450, 457 (Tenn. 2015). When reviewing the post-conviction court's factual findings, this court does not reweigh the evidence or substitute its own inferences for those drawn by the post-conviction court. *Id.*; *Fields*, 40 S.W.3d at 456 (citing *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997)). Additionally, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the [post-conviction court]." *Fields*, 40 S.W.3d at 456 (citing *Henley*, 960 S.W.2d at 579); *see also Kendrick*, 454 S.W.3d at 457. The post-conviction court's conclusions of law and application of the law to factual findings are reviewed de novo with no presumption of correctness. *Kendrick*, 454 S.W.3d at 457.

## II.

### *Ineffective assistance of counsel*

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In order to receive post-conviction relief for ineffective assistance of counsel, a petitioner must prove: (1) that counsel's performance was deficient; and (2) that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (stating that the same standard for ineffective assistance of counsel applies in both federal and Tennessee cases). Both factors must be proven for the court to grant post-conviction relief. *Strickland*, 466 U.S. at 687; *Henley*, 960 S.W.2d at 580; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Accordingly, if we determine that either factor is not satisfied, there is no need to consider the other factor. *Finch v. State*, 226 S.W.3d 307, 316 (Tenn. 2007) (citing *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004)). Additionally, review of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689; *see also Henley*, 960 S.W.2d at 579. We will not second-guess a reasonable trial strategy, and we will not grant

relief based on a sound, yet ultimately unsuccessful, tactical decision. *Granderson v. State*, 197 S.W.3d 782, 790 (Tenn. Crim. App. 2006).

As to the first prong of the *Strickland* analysis, "counsel's performance is effective if the advice given or the services rendered are within the range of competence demanded of attorneys in criminal cases." *Henley*, 960 S.W.2d at 579 (citing *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)); *see also Goad*, 938 S.W.2d at 369. In order to prove that counsel was deficient, the petitioner must demonstrate "that counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688); *see also Baxter*, 523 S.W.2d at 936.

Even if counsel's performance is deficient, the deficiency must have resulted in prejudice to the defense. *Goad*, 938 S.W.2d at 370. Therefore, under the second prong of the *Strickland* analysis, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. (quoting *Strickland*, 466 U.S. at 694) (internal quotation marks omitted).

III.
*Competency evaluation*

Relative to the competency evaluation, the post-conviction court considered the lack of a competency evaluation in the context of trial counsel's developing a sound trial strategy. Specifically, the post-conviction court noted counsel's belief that an evaluation was unnecessary because Petitioner participated in trial preparation and communicated appropriately with the defense team. The record supports the post-conviction court's finding that trial counsel was not deficient in this regard.

We note that Petitioner did not present evidence of what a competency evaluation would have shown at the time of trial or present expert testimony that would have been used at a competency hearing. *See Taylor v. State*, 443 S.W.3d 80, 85 (Tenn. 2014); *Black v. State,* 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). Petitioner's conclusory statement that he would have been found incompetent to stand trial simply because the Franklin County Juvenile Court declared him incompetent at the age of twelve—more than a decade before trial—is unavailing. Similarly, although we do not wish to minimize the seriousness of the issues documented in the Youth Villages records, they do not reflect that Petitioner was incompetent to participate in his defense and stand trial between the time of the rape in 2015 and the time of trial in 2017. We conclude that Petitioner has not established by clear and convincing evidence that he was prejudiced by trial counsel's not seeking a competency evaluation, and he is not entitled to relief on this basis.

## IV.
### *Psychosexual evaluation*

Relative to the psychosexual evaluation, the post-conviction court only considered the issue in the context of trial strategy, noting that trial counsel was concerned that an evaluation would damage Petitioner's case and possibly open the door to evidence of his having abused G.B. The post-conviction court did not make findings of fact or conclusions of law related to counsel's decision not to present such an evaluation as mitigating evidence at the sentencing hearing.

As we stated above, this court may extend appellate review to issues presented for the first time at the post-conviction hearing "if the issue was argued at the post-conviction hearing and decided by the post-conviction court without objection." *Holland*, 610 S.W.3d at 458. Although Petitioner briefly argued the sentencing issue at the post-conviction hearing, the post-conviction court's written order confined its analysis to the issue raised in the post-conviction petition—whether trial counsel was ineffective for failure to develop a reasonable trial strategy, not whether counsel was ineffective for failure to present mitigation evidence in sentencing. Because the post-conviction court did not decide the sentencing issue, we are constrained to conclude that Petitioner's issue is beyond the permissible scope of our review, and it has been waived. *See id.*

We note that, even if this issue were properly raised, Petitioner did not present evidence of what a psychosexual evaluation would have shown at the time of sentencing or present expert testimony that would have been used at the sentencing hearing. *See Taylor*, 443 S.W.3d at 85. As a result, Petitioner did not establish that the lack of a psychosexual evaluation prejudiced him, and he is not entitled to relief on this basis.

## **Conclusion**

Based on the foregoing and the record as a whole, the judgment of the post-conviction court is affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE